**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C21FC LLC, et al., | No. CV-22-00736-PHX-SPL |
| Plaintiffs, | |
| vs. | **ORDER** |
| NYC Vision Capital Incorporated, et al., | |
| Defendants. | |

Before the Court is Plaintiffs' Motion for Temporary Restraining Order ("TRO") (Doc. 13), which the Court construed as both a Motion for TRO and Motion for Preliminary Injunction. On June 7, 2022, the Court denied the Motion for TRO. (Doc. 14). For the following reasons, the Court also denies the Motion for Preliminary Injunction.

**I.  BACKGROUND**

On April 29, 2022, Plaintiffs C21FC LLC and C21VX LLC initiated this action against Defendants NYC Vision Capital Incorporated ("NYCVC"), Wali and Syeda Mondal, Dr. Elie Islam, and Shafi Karim. (Doc. 1). Plaintiff C21FC is a Delaware LLC that franchises retail optical stores, while Plaintiff C21VX is a Delaware LLC that operates retail optical stores. (Doc. 11 at 1). Non-party Alan Singer is the principal member and manager of both Plaintiffs. (Doc. 11 at 18). Defendant NYCVC is a New York corporation. (Doc. 11 at 2). The Mondal Defendants each have 49.5% ownership of NYCVC, and Defendant Islam, an optometrist, owns the remaining 1%. (Doc. 11 at 2).

Defendant Karim is the spouse of Dr. Islam and the son of the Mondals, who are a married couple. (Doc. 11 at 2).

In 2020, Dr. Islam and Mr. Karim began looking into opening an optometry practice in New York City. (Doc. 22-15 at 3). They looked into the Century 21 Vision Express franchise—optical stores within Century 21 department stores, for which C21FC was the franchisor—and paid a $30,000 franchise fee to Plaintiffs before Century 21 declared bankruptcy in mid-2020. (Doc. 22-15 at 3). In November 2020, Singer instead proposed franchising The Eye Man, an existing optometry store that was for sale on the Upper West Side. (Doc. 22-15 at 3–4).

On May 23, 2021, C21FC provided Defendants with a Franchise Disclosure Document ("FDD") for The Eye Man (Ex. 23), and on June 29, 2021, C21FC and NYCVC executed a Franchise Agreement (Ex. 112). Two weeks later, on July 13, 2021, the sellers of The Eye Man and C21VX executed an Asset Purchase Agreement ("APA") for the sale of The Eye Man. (Exs. 4, 115).[1] The Eye Man's sellers and Mr. Singer also executed a Trademark Assignment to assign all rights and interests in The Eye Man trademark, goodwill, and business (the "Marks") to Mr. Singer. (Doc. 11 at 40).

NYCVC, however, had applied for a loan from Celtic Bank to finance the transaction. (Doc. 11 at 7). To ensure that NYCVC would own the loan collateral, the bank requested documentation that the assets purchased under the APA would be owned by NYCVC. (Doc. 11 at 7). Thus, the same day that the APA was executed, July 13, 2021, The Eye Man, C21VX, and NYCVC also executed an Amendment to the APA substituting NYCVC as the "Buyer" in the APA in place of C21VX. (Ex. 113). The Amendment is central to this case, as Plaintiffs argue that it inadvertently failed to differentiate between the physical assets, which were to be transferred to NYCVC, and

---

[1] It appears The Eye Man and C21VX may actually have executed two different versions of the APA—one introduced into evidence by Plaintiffs stating a purchase price of $375,000 (Ex. 4), and one introduced into evidence by Defendants stating a purchase price of $430,000, which they received from Celtic Bank (Ex. 115). While this is certainly suspect, it is unimportant to the resolution of this Motion. As this is Plaintiff's Motion, the Court will cite to Exhibit 4 when referring to the APA.

the Marks, which were to be owned by C21VX (Doc. 11 at 8), while Defendants argue that it effected the sale of all The Eye Man's assets to Defendants (Doc. 22 at 3–4). Closing took place about a week later, on or about July 20, 2021. (Ex. 106).

On July 26, 2021, NYCVC opened The Eye Man store, still operating as though it were a franchise. (Hearing Tr. at 166:6–7). Disputes quickly arose between Plaintiffs and Defendants, and in April 2022, NYCVC sent C21FC a notice of rescission of the Franchise Agreement based on alleged misrepresentations. (Hearing Tr. at 197:23–25). On June 9, 2022, NYCVC reopened The Eye Man across the street from the original location. (Hearing Tr. at 213:23–214:3).

On June 6, 2022, Plaintiffs filed a First Amended Complaint alleging six counts: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) declaratory relief; (4) lien foreclosure; (5) trademark infringement and false registration; and (6) reformation. (Doc. 11). On June 7, 2022, Plaintiffs filed the Motion for Temporary Restraining Order ("TRO") and Motion for Preliminary Injunction (Doc. 13). The Court denied the Motion for TRO on notice grounds and set an expedited briefing schedule and hearing on the Motion for Preliminary Injunction. (Doc. 14). The Motion is fully briefed (Docs. 22, 26), and the Court held an evidentiary hearing on June 15, 2022 at which it heard testimony from Mr. Singer and Dr. Mondal and received dozens of exhibits into evidence (Doc. 29). Based on the briefing, the parties' arguments, and the evidence in the record, the Court now addresses the Motion for Preliminary Injunction.

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). An injunction may be granted only where the movant shows that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent such relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. The Ninth Circuit observes a "sliding scale"

approach that balances these elements "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, an injunction can issue where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.  Still, "[l]ikelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors in the absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal citations and quotation marks omitted).

### III. ANALYSIS

Plaintiffs seek two forms of injunctive relief: (1) an injunction restraining Defendants from using the Eye Man trademark based on the trademark infringement claim; and (2) an injunction restraining Defendants from operating a retail optical store within certain geographic limits and from taking client information based on the breach of non-compete covenant claim. Ultimately, Plaintiffs' entitlement to both turns largely on a single question: who owns The Eye Man? The Court finds that Defendants are the likely owners, that all of the *Winter* factors favor Defendants, and that the Motion for Preliminary Injunction must therefore be denied.

### a. Likelihood of Success on the Merits

#### i. *Trademark Infringement*

To succeed on a trademark infringement claim, "a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011) (internal quotation marks omitted). Only the ownership element is disputed in this case.

Four contracts are most relevant to determining the likely ownership of the Marks: (1) the Franchise Agreement, which provides that NYCVC's right to use the Marks

derives solely from the Franchise Agreement and that the Franchise Agreement does not confer any interest in the Marks to NYCVC (Doc. 11 at 103); (2) the APA, which provides that The Eye Man "agree[s] to transfer to Buyer at Closing all . . . intangible assets" related to The Eye Man business, including the Marks (Doc. 11 at 24); (3) the Amendment to the APA , which provides that "the Parties, in an effort to complete the purchase contemplated by the APA wish to substitute the Replacement Buyer [NYCVC] for the Former Buyer [C21VX] in all respects" (Doc. 11 at 144); and (4) the Trademark Assignment, which provides that The Eye Man assigns all rights and interests in the Marks to Mr. Singer (Doc. 11 at 40).

The Court's analysis must begin with the language of the contracts. *See Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 480 P.3d 1225, 1228 (Ariz. 2021). The Franchise Agreement clearly establishes that NYCVC would have limited rights to use the Marks in accordance with the Agreement. (Ex. 112 at Bates 15). But the APA, executed two weeks later, unequivocally states that The Eye Man would transfer the Marks to "Buyer" at closing (Ex. 4 at Bates 9), and the Amendment, executed the same day and a week before closing, made NYCVC the "Buyer" (Ex. 113). Plaintiffs' argument that the APA and Amendment are not sufficiently clear is unavailing; although the Amendment does not specifically mention the Marks, its substitution of NYCVC for C21VX "in all respects" unmistakably encompasses the sale of the intangible assets. Still, the Trademark Assignment, executed the same day as the APA and the Amendment, plainly provides for transfer of The Eye Man Marks to Mr. Singer. (Doc. 11 at 40).

Plaintiffs argue that all four documents must be read harmoniously because they were executed contemporaneously. Obviously, the APA and the Amendment to the APA must be read together, as the former is "included and made a part" of the latter by reference. (Ex. 113 at 1). But the Franchise Agreement was signed two weeks prior, which is not "substantially contemporaneous" such that it must be read in harmony with the APA and Amendment. *Cf. United Bank of Ariz. v. Allyn*, 805 P.2d 1012, 1019 (Ariz. Ct. App. 1990) (holding that two instruments executed on the same day were

substantially contemporaneous); *Childress Buick Co. v. O'Connell*, 11 P.3d 413, 414–15 (Ariz. Ct. App. 2000) (same); *Realty Assocs. of Sedona v. Valley Nat'l Bank of Ariz.*, 738 P.2d 1121, 1125 (Ariz. Ct. App. 1986) (same). Two weeks is more than enough time for intervening events to change the nature of a transaction and the intentions of the parties to it—as appears to have been the case here—such that the contracts need not be harmonious. And while the Trademark Assignment was executed in close temporal proximity to the APA and the Amendment, Defendants were not a party to the Assignment. As a result, it need not be read in harmony, either. *See Smith v. Superior Equip. Co.*, 428 P.2d 998 (Ariz. 1967) ("It is settled . . . that[ ] when two instruments are entered into *between the same parties* concerning the same subject matter, . . . they may, under some circumstances, be regarded as one contract and construed together." (emphasis added) (internal quotation marks omitted)); *Realty Assocs. of Sedona*, 738 P.2d at 1125 ("Under Arizona law, substantially contemporaneous instruments will be read together to determine the nature of the transaction *between the parties*." (emphasis added)). A contrary holding would allow, in general, for two parties to a tri-party contract to finagle with the meaning of the contract by executing a separate contract on the same day without the third party's knowledge.[2] Thus, the Court reads the Amendment—the only one of the relevant agreements to be signed by all three parties and the last of them to be executed—to do exactly what it says it does: to substitute NYCVC as the Buyer in the APA in *all respects*, including as the buyer of The Eye Man's intangible assets. There is no ambiguity.

That brings the Court to Plaintiffs' argument for reformation of the Amendment. Under Arizona law, "[a] party seeking reformation of a written agreement must show that a definite intention on which the minds of the parties had met pre-existed the written instrument and that the mistake occurred in its execution." *SWC Baseline & Crimson Invs., LLC v. August Ranch Ltd. P'ship*, 265 P.3d 1070, 1078 (Ariz. Ct. App. 2011)

---

[2] Notably, there is no evidence that Defendants had any knowledge of the Trademark Assignment.

6

(internal quotation marks omitted). Mutual mistake must be shown by clear and convincing evidence in order to achieve reformation. *See Long v. City of Glendale*, 93 P.3d 519, 532 (Ariz. Ct. App. 2004). Here, then, to achieve reformation, Plaintiffs would need to show by clear and convincing evidence that prior to execution of the Amendment, Plaintiffs and Defendants had a shared intent that Defendants would be substituted as "Buyers" in the APA only as to the purchase The Eye Man's physical assets, while Plaintiffs would own the Marks. Plaintiffs make no meaningful argument that this was the case.

Even assuming that Plaintiffs can make such a showing with respect to their own intent,[3] Plaintiffs have failed to demonstrate any likelihood that they can make the requisite showing with respect to Defendants' intent. Mr. Singer presented Defendants with an Amendment, drafted by his own attorney, apparently with no explanation and without Defendants having seen the underlying APA, and told them to sign it in order for the bank to approve their loan. (Hearing Tr. at 59:16–24, 161:14–25). Reading the plain

---

[3] It is not a forgone conclusion that this was Plaintiffs' definite intent, as Plaintiffs' conduct throughout The Eye Man transaction is suspect. In addition to the two versions of the APA, discussed *supra* note 1, Mr. Singer appears to have made two separate offers on the same day, December 11, 2020, to buy The Eye Man—one on C21FC's behalf for $375,000 (Ex. 1) and one on Defendants' behalf for $430,000 (Ex. 102)—both of which the sellers of The Eye Man appear to have accepted. Further, the Disbursement Request and Authorization and the ALTA Settlement Statement for the Celtic Bank loan both state that at closing, $430,000 went to Eye Man LTD for "Business Acquisition." (Exs. 106, 116). Mr. Singer, however, testified that upon closing, the loan money was wired to the escrow agent, the law firm representing Mr. Singer. (Hearing Tr. at 102:24–103:11). Mr. Singer then instructed the firm to disburse $187,500 to The Eye Man LTD and some indeterminate amount—apparently in the tens of thousands of dollars—to himself. (Hearing Tr. at 103:20–104:16). Defendants had no knowledge that the loan proceeds would go to anyone except The Eye Man LTD and believed that it would have gone against the terms of the loan for the proceeds to go elsewhere. (Hearing Tr. 165:3–166:5). To be clear, given the lack of clarity about the financial details of the transaction, the Court draws no conclusions based on this information at this time besides limiting Mr. Singer's credibility.

Moreover, in general, the Court found much of Mr. Singer's testimony to be not credible, as it was often vague, unclear, and inconsistent. With respect to the Amendment specifically, his explanation that the Amendment should have made NYCVC the "Replacement Borrower" rather than the "Replacement Buyer" makes little sense because the *only* use of the word "Borrower" in the APA is in reference to "Seller," The Eye Man LTD, being the Borrower with respect to a PPP Loan that The Eye Man had previously obtained. (Hearing Tr. at 60:13–14; Ex. 4 at Bates 10).

language of the Amendment, Dr. Islam testified that Defendants suspected that NYCVC becoming the Buyer "in all respects" meant exactly that: that NYCVC would purchase all of The Eye Man's assets. (Ex. 113; Hearing Tr. at 161:18–162:3, 194:3–6). The other language of the Amendment supports the credibility of her testimony: it would not make sense for NYCVC to "accept the obligations of Buyer as defined in the [APA]" without limitation if it were not also receiving all of the benefits without limitation.[4] (Ex. 113). As Dr. Islam testified, prior to signing the Amendment, NYCVC had no obligations to The Eye Man LTD; it merely had the Franchise Agreement with C21FC. (Hearing Tr. at 162:8–24). Thus, to Defendants, their agreement to "accept the obligations of Buyer" to the Seller, The Eye Man LTD, in place of Plaintiffs completely changed the deal. (Hearing Tr. at 162:25–163:10). There is no reason to believe that Defendants intended for the Amendment to apply only to The Eye Man's physical assets.

To be sure, Defendants did not know with certainty that by signing the Amendment, they were buying the Marks.[5] But that fact does not amount to evidence that they shared Plaintiffs' asserted intent that the Amendment would apply only to The Eye Man's physical assets. Likewise, the Court gives no weight to the fact that Defendants continued to operate as though NYCVC was a franchisee of Plaintiffs from the time they signed the Amendment until they finally received the APA from Celtic Bank in September 2021; during that time, they were trying to get a copy of the APA from Mr. Singer to confirm their suspicion that the Amendment had made NYCVC the buyer of the Marks, but he refused to provide one. (Hearing Tr. at 161:25–162:7; 194:20–24). The Court also gives little weight to the fact that Defendants continued to pay royalties to

---

[4] In general, the Court found Dr. Islam's testimony to be highly credible, consistent, and detailed.

[5] Not only did Dr. Islam testify to this fact (Hearing Tr. at 194:12–15), but Defendants' legal counsel stated in a demand letter to Mr. Singer on November 23, 2021 that "unbeknownst to [Defendants]," The Eye Man trademark and goodwill were included among the assets purchased pursuant to the APA and Amendment. (Ex. 6 at Bates 175). Still, counsel's statement is not inconsistent with Dr. Islam's testimony that Defendants *suspected* that NYCVC may have purchased the Marks.

Plaintiffs after receiving the APA: at that point, it appears that they quickly hired counsel, and, notably, registered the Marks. (Hearing Tr. at 197:5–15; Doc. 11 at 147). Accordingly, Plaintiffs have shown no likelihood that they can present clear and convincing evidence that prior to executing the Amendment, the parties had a meeting of the minds that the Amendment would substitute NYCVC as the APA's "Buyer" only with respect to The Eye Man's physical assets.

The existence of the Franchise Agreement and the Trademark Assignment do not compel a contrary conclusion. As to the Franchise Agreement, "[a] binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them." Restatement (Second) of Contracts § 213 (1981); *see Dunn v. FastMed Urgent Care PC*, 424 P.3d 436, 440 (Ariz. Ct. App. 2018). And even assuming that the Trademark Assignment effected a transfer of the rights to the Marks to Mr. Singer,[6] it is likely void against Defendants pursuant to 15 U.S.C. § 1060(a)(4). That statute provides that "an assignment shall be void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office within 3 months after the date of the assignment or prior to the subsequent purchase." Mr. Singer admits that he did not record the Assignment (Hearing Tr. at 56:4–8), and instead Plaintiffs argue that "after more than six months of negotiations and signing the FDD and Franchise Agreement, Defendants were clearly put on notice of the Assignment of the Marks to Plaintiffs." (Doc. 26 at 7). But when Defendants signed the FDD and Franchise Agreement on June 29, 2021, there had been no assignment of the Marks to Plaintiffs; the Trademark Assignment was executed two weeks later, on or about July 13, 2021. (Doc. 11 at 40). While Mr. Singer had represented to Defendants that he or his affiliated entities owned the Marks before that date, there had been no such assignment. (Hearing Tr. at 157:19–158:9) Defendants

---

[6] This is not necessarily a valid assumption, as the APA provides that "Seller . . . agree[s] to transfer to Buyer *at Closing*" The Eye Man's intangible assets, including the Marks. (Ex. 4 at Bates 9 (emphasis added)). By the time of closing, NYCVC had been substituted as the Buyer by the Amendment.

9

could not have been on notice of an assignment that had not occurred. There is also no evidence that Defendants because aware of the Trademark Assignment between the execution of the Assignment and the execution of the Amendment, or even Defendants' recordation of the Marks with the Patent and Trademark Office.

In sum, the plain language of the APA and the Amendment clearly states that NYCVC purchased the Marks, and Plaintiffs have failed to demonstrate any likelihood that the Amendment should be reformed. As such, there is no serious question that Plaintiffs lack a protectible ownership interest in the Marks and thus also lack a likelihood of success on their trademark infringement claim. Accordingly, the Court need not address the remainder of the *Winter* factors in order to deny injunctive relief on these grounds, s*ee Disney Enters., Inc.*, 869 F.3d at 856, but will nonetheless do so after addressing the merits of the breach of covenant claim. Still, Plaintiffs are not entitled to an injunction based on the trademark infringement claim.

## ii.   Breach of Covenant Not To Compete

The parties' Franchise Agreement provides that during the term of the Agreement, Defendants may not "perform services for, or have any direct or indirect interest . . . in, a Competitive Business."[7] (Doc. 11 at 106). It further provides that for one year after termination or expiration of the Agreement, Defendants may not "engage in a competitive business within ten (10) miles of" The Eye Man store. (Doc. 11 at 106).

Restrictive covenants are disfavored, particularly when applied to medical professionals. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1282 (Ariz. 1999). Still, covenants not to compete are enforceable if they are "ancillary to contracts for employment or sale of a business," to include the sale of a franchise. *Gann v. Morris*, 596 P.2d 43, 44 (Ariz. Ct. App. 1979); *Fitness Together Franchise Corp. v. C.P. Body Design, Inc.*, No. CIV-09-02230-MHM, 2010 WL 11628010, at *8 (D. Ariz. Feb. 24,

---

[7] The Agreement defines a "Competitive Business" as one that derives more than $10,000 of revenue per year "from providing products and services similar to the products and services offered by The Eye Man . . . ." (Doc. 11 at 106).

2010). A covenant not to compete is unreasonable, and therefore unenforceable, if "(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 725 (Ariz. 2006) (quoting Restatement (Second) of Contracts § 188 (1982)).

In the franchise context, courts have held that "[l]egitimate business interests include protecting confidential information, trade secrets, and business goodwill." *ReBath LLC v. New Eng. Bath Inc.*, No. CV-16-01700-PHX-DLR, 2016 WL 8670165, at *3 (D. Ariz. July 15, 2016). These interests are protectible through restrictive covenants because if franchisees were permitted to simply switch business names, it might signal to customers that the franchisee has lost faith in the franchisor's brand or suggest that franchisees can simply leave the franchise and immediately start competing if they are dissatisfied. *Id.*

It is not entirely clear what interests Plaintiffs claim the non-compete provision protects. To the extent they claim an interest in The Eye Man's customer list, goodwill, and other such intangibles, there is a glaring problem: it is unlikely that Plaintiffs are or ever were the owners of those intangibles for the reasons discussed above.[8] Pursuant to the APA and the Amendment, it is likely that Defendants bought those assets directly from The Eye Man's sellers. Thus, Plaintiffs likely have *no* interest in protecting those assets, and no matter how narrowly the Court could construe the non-compete provision, it would still be unreasonable under the first *Fearnow* prong.

Plaintiffs likely do, however, have an interest in their own so-called "secret sauce"—that is, the training and knowledge that Mr. Singer and his associates provided to Defendants while opening The Eye Man—no matter how stale Defendants believe it to be. The Court credits Dr. Islam's testimony that the information imparted by Plaintiffs

---

[8] Plaintiffs claim that they owned The Eye Man, at minimum, from the time the APA was signed until the Amendment was signed. Not so. The APA provides that The Eye Man's assets would be transferred at closing, not upon execution of the APA. (Ex. 4 at Bates 8–9).

was cursory, basic, and had little value such that Plaintiffs' interest is very weak. (Hearing Tr. at 172:13–176:1). Even if the scope of the non-compete provision is unreasonable as written, however, Plaintiffs highlight a clause of the Franchise Agreement providing that if the non-compete provision is found unenforceable, it will be deemed modified to the extent necessary to make it enforceable—which would certainly apply to opening a store across the street two months after termination of the Agreement. (Ex. 112 at Bates 34).

Still, Defendants argue that they have validly rescinded the Franchise Agreement, to include the non-compete provision, pursuant to the New York Franchise Sales Act ("NYFSA"), N.Y. Gen. Bus. L. § 691(1), which provides for rescission upon willful and material violations of specified statutes.[9] Defendants allege several such violations, but the Court need only consider one to determine that the Franchise Agreement is likely rescinded: § 683(1) prohibits selling or offering to sell a franchise without registering with the State. Plaintiffs do not dispute that they violated the statute nor that the violation was willful, instead arguing that the violation was not material. (Doc. 13 at 15).

To the contrary, the Court finds that Plaintiffs' failure to register likely was material. Under New York law, an act or omission is material if a party would have acted differently but for that act or omission. *See Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 112 (S.D.N.Y. 2020). Here, Dr. Islam testified that Defendants asked Mr. Singer prior to executing the Franchise Agreement whether the franchise was registered, and he answered affirmatively. (Hearing Tr. at 158:10–20). She further testified that, had Defendants known that Plaintiffs had not registered the franchise, they would not have signed the Franchise Agreement because they would not have wanted to work with someone who was not abiding by the law. (Hearing Tr. at 158:21–24); *cf. A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 70 F. Supp. 3d 376, 409 (D.D.C. 2014) (holding

---

[9] New York law applies to this issue because the Franchise Agreement provides that it is governed by Arizona law, except with respect to the law governing franchises and the relationship of franchisors and franchisees. (Ex. 112 at Bates 36–37).

that there was not a triable issue of fact regarding materiality on a NYFSA claim where there was no evidence that the franchisee would not have gone forward with the sale if they had known the franchise was unregistered); *Baker Boys of Glendale, Inc. v. 35-63 82nd St. Corp.*, 560 N.Y.S.2d 465, 467 (N.Y. App. Div. 1990); *BMW Co., Inc. v. Workbench, Inc.*, No. 86 CIV. 4200 (RO), 1988 WL 45594, at *2 (S.D.N.Y. Apr. 12, 1988). The Court found Dr. Islam's testimony credible. Accordingly, the Court finds that Plaintiffs likely violated § 683(1) willfully and materially, making them liable for rescission pursuant to § 691(1). As a result, the Franchise Agreement is likely void, and it is as though there was never a non-compete covenant in the first place. *See Broder v. Pallotta & Assocs. Dev., Inc.*, 130 N.Y.S.3d 75, 79 (N.Y. App. Div. 2020) ("The effect of rescission is to declare the contract void from its inception and to put or restore the parties to status quo."). Plaintiffs are unlikely to succeed on their claim for breach of the covenant not to compete given that there is no such enforceable covenant between the parties.

Nonetheless, Plaintiffs argue that they are *still* entitled to an injunction because, given that Defendants cannot give back the training and knowledge they received from Plaintiffs, the best way to restore the parties to their original positions is to enforce the non-compete provision.[10] But this argument goes to the appropriateness of equitable relief—not whether Plaintiffs are likely to succeed on the merits of their breach of covenant claim.[11] At this stage, the appropriateness of equitable relief is determined

---

[10] Plaintiffs also make an argument that if the Franchise Agreement is rescinded, the Court should "put[ ] the parties in the positions they were in before June 29, 2021 (the execution date of the Franchise Agreement) when Plaintiffs owned the Marks (pursuant to their binding agreement with The Eye Man of December 22, 2020)," and thus Plaintiffs are entitled to injunctive relief as to the Marks. (Doc. 26 at 2). This argument is unfounded for multiple reasons, most obviously because an agreement to purchase something, even if binding, is not equivalent to ownership of it.

[11] To be sure, rescission itself is an equitable remedy, but it was appropriate for the Court to consider the availability of rescission to Defendants in order to determine whether there is an enforceable non-compete covenant and thus whether Plaintiffs' claim for breach of that covenant is likely to succeed. *See Beck Chevrolet Co., Inc. v. Gen. Motors LLC*, 787 F.3d 663, 680 (2d Cir. 2015); *see also Mister Softee, Inc. v. Tsirkos*, No. 14 Civ.1975(LTS)(RLE), 2014 WL 2535114, at *6–7 (S.D.N.Y. June 5, 2014)

through the *Winter* factors. Thus, the Court gives weight to Plaintiffs' restoration argument in conjunction with the appropriate factors, but it does not affect the Court's conclusion that Plaintiffs' breach of covenant not to compete claim is unlikely to succeed on the merits.

### b. Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm is harm "that cannot be redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted).

Here, Plaintiffs argue that they will suffer irreparable harm based on loss of clientele, business, and goodwill, and from losing control of the Marks and of The Eye Man brand.[12] "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm," but "[t]hose seeking injunctive relief must proffer *evidence* sufficient to establish a *likelihood* of irreparable harm." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250–51 (9th Cir. 2013) (emphasis added) (holding that platitudes about goodwill and reputation, not grounded in evidence, are insufficient to establish a likelihood of irreparable injury in a trademark case). Considering all of the evidence proffered, the Court finds that Plaintiffs have failed to establish such a likelihood. There is no evidence that The Eye Man has lost customers under Defendants' operation nor that the store's reputation has suffered. Plaintiffs have offered no evidentiary support for their assertion that Defendant Karim has been offering

---

(considering the defendant's rescission argument in evaluating the likelihood of success of the plaintiff's breach of covenant not to compete claim). In other words, the rescission issue must be accounted for in evaluating Plaintiffs' likelihood of success on the breach claim, whereas Plaintiffs' argument as to equitable restoration flows *from* those issues rather than preceding them.

[12] Plaintiffs also argue that they are entitled to a presumption of irreparable harm pursuant to 15 U.S.C. § 1116(a), but that presumption arises only where a party has shown a likelihood of success on the merits of a trademark infringement claim. As discussed, Plaintiffs have not shown such a likelihood.

optician services despite not being licensed. Rather, Dr. Islam credibly testified that Defendants have had no trouble keeping or attracting patients or finding vendors. (Hearing Tr. at 177:2–184:14). There is some evidence that Defendants' business strategy differs from Plaintiffs' by prioritizing patient needs over sales, but the Court finds that evidence insufficient to establish a likelihood of harm. The different business strategies also bely Plaintiffs' claim that that an injunction is necessary to protect the training and knowledge that they provided to Defendants and Plaintiffs' ability to compete. To the extent any significant training and knowledge was actually imparted, which is doubtful, it is apparent that Defendants are largely not using it. In sum, the Court finds that Plaintiffs have failed to establish a likelihood of irreparable harm.

### c. Balance of Equities

Plaintiffs argue that the balance of the equities tip in their favor because Plaintiffs are not imminently in a position to make use of the Marks,[13] so even if Defendants are the true owners of the Marks, an injunction will cause them no harm because there is no immediate threat of anyone else using the Marks. (Doc. 13 at 11). Likewise, Plaintiffs argue that if the non-compete clause is enforced, Defendants will still be able to operate a retail optical store outside of the 10-mile radius. (Doc. 13 at 14). On the other hand, Defendants argue that an injunction would destroy their business that they have spent hundreds of thousands of dollars on—that they would have to lay off staff, cancel appointments, and sit on inventory while continuing to make rent and loan payments. (Doc. 22 at 5, 11).

The Court finds Defendants' argument to be the stronger one. Plaintiffs' arguments ignore the reality of the circumstances to minimize the hardships an injunction would place on Defendants. While Plaintiffs may have some speculative harm based on the difficulty of competing with a retail optical business that may have some knowledge

---

[13] Mr. Singer's own testimony partially contradicted this argument, however, as he stated that Plaintiffs would be in a position to open a retail optical store immediately upon signing a lease. (Hearing Tr. at 81:15–19).

that Plaintiffs themselves imparted, it is certainly outweighed by Defendants' concrete harm. Defendants have, in fact, spent time and money to develop their business under The Eye Man Marks—which they likely own pursuant to the Amendment drafted by Plaintiffs—on the Upper West Side of Manhattan. To issue the requested injunction would force them to close that business and redo the process and expenses elsewhere under a different name. Plaintiffs' counterargument that this harm was self-inflicted is unavailing given that Defendants are the likely owners of The Eye Man and thus were likely well within their rights to open the business. Further, Plaintiffs rely on *Sierra Club v. Trump* in support of their argument that self-inflicted losses should not be given weight when balancing harms. 929 F.3d 670, 706 (9th Cir. 2019). But there, the Ninth Circuit was referring to costs undertaken after a motion for preliminary injunction was filed. *Id.* Here, Defendants did open their Eye Man store two days after Plaintiffs filed the instant Motion, but by that time, they had already incurred the bulk of the costs to develop the store. While Defendants face significant losses if an injunction were to issue, Plaintiffs have no concrete business plans, and, as discussed, have provided minimal evidence of harm. The balance of equities favors Defendants.

### d. Public Interest

The Court finds that this factor is of little importance in this case, but it nonetheless weighs against an injunction. As to the injunction against use of the Marks, in trademark cases, the public interest favors the protection of trademarks and the prevention of consumer confusion. *See Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999); *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). Thus, the public interest favors whichever party is the true owner of the Marks—which here, is likely Defendants.

As to the non-compete provision, Plaintiffs argue that the public interest favors an injunction because there is no public interest in unfair competition and the economy depends on the enforcement of contracts. (Doc. 13 at 14). But this argument carries weight only if Plaintiffs are likely to succeed on the merits, which they are not. On the

other hand, Defendants argue that public policy favors a patient's right to see the doctor of their choosing, citing *Valley Medical Specialists*. (Doc. 22 at 15). Again, then, the public interest favors Defendants.

## IV.     CONCLUSION

The resolution of this Motion largely turns on the central question of who owns The Eye Man, a question addressed under the first and most important *Winter* factor. The question is likely to be answered using the simple principle "that when parties bind themselves by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written." *Roe v. Austin*, 433 P.3d 569, 574 (Ariz. Ct. App. 2018) (internal quotation marks omitted). Here, under the unambiguous terms of the APA and Amendment, it is very likely that Defendants own The Eye Man, including its Marks. Accordingly, Plaintiffs have not demonstrated a likelihood of success nor serious questions going to the merits of the trademark infringement claim. Moreover, it is likely that Defendants are entitled to rescission of the Franchise Agreement such that there is no enforceable non-compete covenant, meaning Plaintiffs have not shown a likelihood of success on the breach of covenant claim, either. Plaintiffs have also failed to offer evidence showing a likelihood of irreparable harm, and the balance of equities and the public interest weigh against restraining Defendants from operating an optical business that they likely own pursuant to a contract drafted and executed by Plaintiffs themselves. Having considered all of the evidence and the arguments of the parties, and having individually considered the *Winter* factors with respect to both claims for injunctive relief, the Court finds that Plaintiffs are not entitled to a preliminary injunction.

///

///

///

///

///

///

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction, which the Court construes within the Motion for Temporary Restraining Order (Doc. 13) is **denied**.

Dated this 17th day of June, 2022.

Honorable Steven P. Logan
United States District Judge